

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00268-CR

**JOSE ANGEL BEDOLLA,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the 272nd District Court
### Brazos County, Texas
### Trial Court No. 09-02939-CRF-272

## MEMORANDUM  OPINION  ON  REMAND

Appellant Jose Bedolla was found guilty by a jury of aggravated assault with a deadly weapon and leaving the scene of an accident involving injury. In his initial appeal, Bedolla's sole issue asserted that the trial court erred in denying his request for a self-defense-with-deadly-force instruction. Bedolla had requested a self-defense jury instruction on the aggravated-assault count, but it was denied by the trial court. We agreed with the State's contention that Bedolla did not preserve this complaint because his request for a self-defense instruction was not specific and specificity was required in

this case. *Bedolla v. State,* No. 10-11-00268-CR, 2013 WL 2253966, at *2 (Tex. App.—Waco May 9, 2013), *rev'd,* 442 S.W.3d 313 (Tex. Crim. App. 2014). The Court of Criminal Appeals disagreed, reversed our judgment, and remanded the case for us to consider Bedolla's issue. *Bedolla,* 442 S.W.3d at 317.

> A trial court must charge the jury on any defensive issue raised by the evidence, "regardless of its substantive character." *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997).
>
> > A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether it is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that the testimony is not entitled to belief. The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge.
> >
> > *Id*. (quoting *Williams v. State*, 630 S.W.2d 640, 643 (Tex. Crim. App. 1982)).
> >
> > This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence. [citation omitted] When a judge refuses to give an instruction on a defensive issue because the evidence supporting it is weak or unbelievable, he effectively substitutes his judgment on the weight of the evidence for that of the jury. [citation omitted] The weight of the evidence in support of an instruction is immaterial.
> >
> > *Id*. (quoting *Woodfox v. State*, 742 S.W.2d 408, 409-10 (Tex. Crim. App. 1987)).

*East v. State*, 76 S.W.3d 736, 737 (Tex. App.—Waco 2002, no pet.).

We review the evidence in the light most favorable to the defendant to determine whether a defensive issue should have been submitted. *See Ferrel v. State,* 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); *Johnson v. State,* 157 S.W.3d 48, 50-52 (Tex. App.—Waco

2004, no pet.).

Because the factual background is set out thoroughly in our initial opinion and in the Court of Criminal Appeals' opinion, we will not repeat it. The indictment charged that Bedolla "did then and there intentionally, knowingly or recklessly cause bodily injury to Janniful Walton by running over her with a motor vehicle and the defendant did then and there use or exhibit a deadly weapon, to-wit: a motor vehicle, during the commission of said assault."

The State argues that Bedolla was not entitled to a self-defense instruction because he did not admit to the offense of aggravated assault with a deadly weapon.

> To rely on "self-defense," the defendant must first admit committing the conduct which forms the basis of the indictment; the defense is inconsistent with a denial of the conduct. *Kimbrough v. State*, 959 S.W.2d 634, 640 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd); *McDonald v. State*, 761 S.W.2d 56, 60 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). All statutory affirmative defenses "justify the defendant's admitted participation in the act itself." *Sanders v. State*, 707 S.W.2d 78, 81 (Tex. Crim. App. 1986). However, the Court of Criminal Appeals has explained that "admitting the conduct" does not always mean admitting the commission of every statutory element of the offense. For example, in *Martinez v. State*, the defendant was charged with murder. *Martinez v. State*, 775 S.W.2d 645, 645 (Tex. Crim. App. 1989). He admitted to pulling a gun, firing into the air, and having his finger on the trigger when the fatal shot was fired. *Id.* at 647. However, he denied the element of "intent to kill." *Id.* The Court held he had "sufficiently admit[ted] to the commission of the offense." *Id.* (*see* cases in accord cited therein); *Torres v. State*, 7 S.W.3d 712, 715 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also Willis v. State*, 790 S.W.2d 307, 314 (Tex. Crim. App. 1990) (denial of the "intent" element of theft does not automatically negate an affirmative defense).

*East*, 76 S.W.3d at 738.

At trial, Bedolla testified as follows on direct examination:

Q. And what happened when you stopped the car?

A. Whenever I stopped the car, I seen a knife in her hand, coming at me, and that's when I punched her once in the face.

….

Q. Okay. And then when you punched her - - I mean, why were you punching her? Why - - what was the reason for punching her?

A. Well, first of all, I did it - - when I first seen the knife - - as soon as I seen the knife come at me, it was just reaction. I just punched her.

….

Q. Okay. When you punched her, did you - - what did you try to do - -

A. After I - -

Q. - - after that?

A. After I punched her, I tried taking the knife away, and that's when she cut me. She did cut me. She dropped the knife and - -

….

As soon as she pulled the knife out and I punched her, I did not know where the knife had fallen or landed. And I told her, "Get out. Get the F out of my car."

She still wouldn't. That's when I reached in my pocket and pulled my phone out. And I remember her slapping it or trying to grab the phone out of my hand. And I do not recall where it landed, also.

I remember her stepping out of the car, and as soon as she stepped out of the car, her trying to reach underneath, like, the passenger floorboard, where she was at, and me taking off and the door just slamming because the acceleration of the force. The acceleration, the - - made the force of - - the door close.

Q. Okay. What - - so she was outside the car, reaching back in?

A. She was trying to reach for something.

Q. Okay. And what did - - what did you think she was reaching for?

A. I'm guessing she was trying to reach for my phone or the knife.

Q. Okay. And at this time, what - - what were you feeling inside? Were you --

A. I was - -

Q. - - scared?

A. I was scared, nervous. I ain't never had nobody pull a knife out on me, so I was just scared.

Q. And when you took off in the car, were you - - were you intending to run her over with your car?

A. I did not know I was going to run her over. I did not intentionally run her over. I did not even know I was even close to her. I just took off. As soon as she stepped out, I just …

Q. Were you in a calm or panicked state at this time?

A. I was in a panic. I was in panic mode.

Q. Did you even - - did it even enter your mind that night, when you hit the accelerator, that - - that she was going to fall and you were going to run over her?

A. No, it did not.

Q. Did you intend to use your car as a deadly weapon?

A. No, I did not.

Q. After you hit the accelerator and the door - - I guess the door closed and she - - and she fell, did you feel anything?

A. Yes. After I took off and I - - the - - I heard the door close because the acceleration of the force made the door close, I felt the - - the fender-side back tire run over something or hit something. And to myself, I was thinking, please God, tell me I just - - I just did not hit her.

….

On cross-examination, Bedolla testified as follows:

Q. Now, on April 11, 2009, you were driving that car that ran over Janniful Walton?

A. Yes, sir.

….

Q. She dropped the knife?

A. Yes.

Q. It was gone?

A. Yes.

Q. And so at that point - - at that point, you weren't afraid of her anymore?

A. I was shocked.

Q. But you weren't afraid for your life?

A. Yes, I was.

Q. You were in fear of your life?

A. Yes. When somebody just pulled a knife on you, you're just going to sit there or - - or what? Yes, I was afraid.

Q. Okay. And - - and once you knew that she didn't have the knife, you were still afraid for your life?

A. Yes. As soon as she stepped out, she started reaching over for something. I just took off.

….

Q. And it's because you didn't think that you had the right to run her over with the car for what she had done?

A. Like I said, I was doing that in self-defense. I did not intentionally - - and I - - I did not know I was going to run over her.

The State primarily asserts that Bedolla was not entitled to a self-defense instruction because he did not admit that he ran over Walton; the State repeats that assertion several times in its brief. While Bedolla denied that he intentionally or knowingly ran over Walton and that he did not know he was going to run over her, he plainly admitted to running over her early in the State's cross-examination, as set forth above. He also testified that it did not enter his mind that she would fall and that he would run over her, and he said he did not even know that his car was close to her. Bedolla was not directly questioned on whether he acted recklessly when he accelerated his car while Walton was reaching back into the car.

In *East*, we explained that the defendant must admit committing the conduct that forms the basis of the indictment and that "admitting the conduct" does not always mean admitting the commission of every statutory element of the offense. *East*, 76 S.W.3d at 738 (citing and discussing *Martinez*). We conclude that Bedolla admitted to committing the charged conduct, and viewing Bedolla's testimony in the light most favorable to Bedolla, the evidence raised the issue of self-defense. We thus find that the trial court erred in denying Bedolla's request for a self-defense-with-deadly-force instruction. *See Johnson v. State,* 157 S.W.3d 48, 52 (Tex. App.—Waco 2004, no pet.).

We next address whether Bedolla suffered "some harm" as a result of the trial court's denial. *Id.* (citing *Ovalle v. State,* 13 S.W.3d 774, 786 (Tex. Crim. App. 2000)

(quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). "[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*

We begin with voir dire, where the State questioned the venire on self-defense for fourteen pages in the reporter's record because it was anticipating that Bedolla's strategy might be self-defense, given that Walton had cut Bedolla with a knife.

Much of the State's case-in-chief was devoted to establishing that it was Bedolla who ran over Walton with his car. Walton, an admitted prostitute, testified that Bedolla drove up to her and propositioned her for oral sex; she agreed and got in Bedolla's car. She said that as they drove, she changed her mind and asked to be let out, but Bedolla refused to let her out. She then reached over to try to turn off Bedolla's car key so the car would stop and she could get out, but Bedolla punched her in the face two times. She then cut Bedolla with her pocketknife and tried to get out of the car, but Bedolla had grabbed her by the jacket. She pulled herself out of her jacket and fell out of the car, and Bedolla ran over her.

Bedolla's version is that after he picked up Walton, she accused him of already having picked up another prostitute that night, which he denied. He then changed his mind and told her he did not want oral sex. Walton acted disappointed and told him to drop her off at her sister's house. When they were at a stop sign near the street where Walton's sister lived, Walton reached over, turned off the car, and tried to take the key

out of the ignition. He put the car in "park," restarted it, and continued driving. When he got near Walton's sister's house, Walton told him stop, which he did. When he stopped, he then saw a knife in Walton's hand coming at him, so he punched her. The remainder of Bedolla's version, including his self-defense testimony, is set out above.

Before closing argument began, Bedolla, who had previously tendered necessity and self-defense instructions for the charge, requested inclusion of the self-defense instruction, but the trial court denied it. In closing argument, the State commented that self-defense was not in the case: "[I]f he intentionally ran over her, he knowingly ran over her or he recklessly ran over her, that is a guilty verdict. There is no question here about whether or not I'm defending myself or anything like that." Bedolla's closing argument primarily focused on whom the jury should believe—Bedolla or Walton. In rebuttal, the State again focused on self-defense not being in the case: "And this isn't a case about self-defense. There is no self-defense in your charge … ."

The State argues that Bedolla suffered no harm because the jury rejected his necessity defense to the offense of leaving the scene of an accident involving injury, and, had a self-defense instruction been given on the aggravated-assault count, the jury would have rejected it as well. The State relies on *Masterson v. State*, 155 S.W.3d 167 (Tex. Crim. App. 2005), but we find it legally and factually distinguishable because it involved lesser-included offenses. *See id.* at 171-72. The defendant was found guilty of capital murder but the jury could have found him guilty of manslaughter. The court reasoned that the omission of criminally negligent homicide as another lesser-included offense in the charge was harmless because, by convicting the defendant of capital

murder when it could have convicted him of manslaughter, the jury did not believe the defendant's version of how the death occurred. *Id.* at 172.

Here, however, there are two distinct offenses, and on the record before us, it is plausible that a jury could convict Bedolla on the offense of leaving the scene of an accident involving injury but acquit him of aggravated assault. A jury could plausibly conclude that Bedolla acted in self-defense when he drove off and ran over Walton in the process, yet also conclude that, once he had run over Walton and saw that she was injured and that her knife was in his car, there was no necessity that he leave the scene; *i.e.*, it was not "immediately necessary to avoid imminent harm." We thus reject the State's argument as speculative. *Cf. Polen v. State,* No. 10-12-00155-CR, 2014 WL 588034, at *2 (Tex. App.—Waco Feb. 13, 2014, pet. ref'd) (mem. op., not designated for publication) ("Any attempt to calculate how the trial court exercised its normative function in assessing Polen's cocaine possession sentence "would necessarily entail pure speculation.") (citing *Jordan v. State,* 256 S.W.3d 286 (Tex. Crim. App. 2008); and *Hernandez v. State,* 332 S.W.3d 664, 669 (Tex. App.—Texarkana 2010, no pet.) (op. on reh'g) ("we cannot assume that the trial court would assess the same punishment on the conviction of a third-degree felony as it would on the conviction of a first-degree felony")).

Bedolla's trial strategy was twofold; he sought to discredit Walton and to prove self-defense. Considering his self-defense strategy, his extensive testimony on self-defense, and the State's focus two times in closing argument on self-defense not being in the charge (with Bedolla thus not being able to argue it in closing), we conclude that

Bedolla suffered "some harm" from the trial court's refusal to include a self-defense instruction in the charge on the aggravated-assault count. We sustain Bedolla's sole issue.

Accordingly, we reverse the judgment of conviction for aggravated assault with a deadly weapon and remand that count for a new trial. Because Bedolla does not complain on appeal about his judgment of conviction for leaving the scene of an accident involving injury, we affirm it.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed in part, reversed and remanded in part
Opinion delivered and filed April 16, 2015
Do not publish
[CR25]

